## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| CARLSON WAGONLIT TRAVEL, INC., | Civil Case No. 08-cv-2706 (DSD/JSM) |
| Plaintiff, | |
| vs. | |
| ACTUATE CORPORATION, | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Defendant. | |

---

## I.
## <u>INTRODUCTION</u>

This Memorandum is submitted on behalf of Plaintiff Carlson Wagonlit Travel, Inc. ("Carlson") in support of its Motion for Temporary Restraining Order.

Carlson is the world's largest travel management company. It was forced to commence this action seeking emergency injunctive relief to prevent the wrongful termination of a software license covering critical software Carlson depends upon for its day to day operations and ongoing provision of travel management services to its customers. If Carlson's software vendor, Defendant Actuate Corporation ("Actuate"), is allowed to wrongfully terminate the license, Carlson, its customers, and traveling consumers will suffer devastating and irreparable harm, including potentially jeopardizing the safety of the subject travelers.

Actuate has threatened that Carlson's software license will terminate on June 26, 2008 if Carlson does not capitulate to Actuate's baseless monetary demands. The amounts demanded by Actuate have exceeded four million dollars. Actuate's threats to

terminate the license are based on unfounded claims Carlson utilized the software in an unlicensed and infringing manner.  Carlson's investigation has revealed such allegations are part of a pattern or practice by Actuate to extract money from its customers based on unwarranted infringement claims and threats to terminate critical software license agreements.

The controlling *Dataphase* factors compel the issuance of a temporary restraining order to preserve the status quo and maintain the license agreement until the dispute between the parties can be decided or otherwise resolved.  First, Actuate's grounds for threatening to cancel the license lack merit and Carlson will succeed on the merits. Second, Carlson, its customers, and the traveling public will suffer devastating and irreparable harm if Actuate is allowed to terminate the license agreement; including, without limitation, potentially jeopardizing traveler safety.   Third, Actuate has an adequate monetary remedy for its claims of unauthorized and infringing use of the software.

## II.
## BACKGROUND FACTS

### A.    The Parties

Carlson is the world's largest travel management company.  It is also the global leader n business travel management.  Carlson is dedicated to helping companies of all sizes, as well as government institutions, optimize their travel programs and provide best-in-class service and assistance to travelers. (Declaration of Jason Vetsch, ¶3.)

Actuate provides software and services for enterprise reporting and performance management applications. (Vetsch Dec., ¶4.)

B.     **Nature of the Dispute**

Carlson has licensed from Actuate certain critical software utilized in Carlson's Program Management Center ("PMC").  The PMC is a reporting portal currently used by over 10,000 of Carlson's corporate travel clients in over 60 countries.  The PMC pulls data from a global data warehouse to report on travel trends and history.  Without limitation, corporate travel managers use these reports to learn where their company is spending travel dollars, what suppliers they are using, average pricing and any travel policy violations. (Vetsch Dec., ¶4.)

Actuate has wrongfully alleged Carlson is using Actuate's software in an unlicensed and infringing manner and threatened the license will terminate on June 26, 2008 if Carlson does not capitulate to Actuate's monetary demands.  Actuate's demands have exceeded four million dollars. (Vetsch Dec., ¶5-6, Exs. A-B.)

The allegedly "unauthorized" use claimed by Actuate relates to the installment and use of Actuate software in Carlson's non-production testing environment.  Specifically, Actuate alleges Carlson wrongfully installed and used the licensed software on Carlson computers dedicated to development and quality assurance work.  Contrary to Actuate's assertions, such supposedly "unauthorized" use has occurred with Actuate's full knowledge and permission.  In fact, Actuate employees, representatives and consultants have actively utilized such "unauthorized" software in the development and quality assurance environment, both remotely and on Carlson's premises, on an ongoing, recurring and regular basis. (Vetsch Dec., ¶8-9.)

Carlson has not engaged in any unauthorized use of Actuate's software and has paid all amounts due and owing under the license agreement.  To date, Carlson has paid

Actuate approximately two million dollars for the licensed software and maintenance fees. In addition, Carlson has paid Actuate consulting fees relating to the software of approximately one million dollars. (Vetsch Dec., ¶7.)

**C.   THE SOFTWARE LICENSE AGREEMENT**

   1.   **Production vs. Test Environment**

To understand this dispute, it is necessary to understand the difference between use of licensed software in a "production" versus a "test" environment.  Carlson utilizes the licensed Actuate software in both environments.  The "production" environment is revenue generating.  In the production environment, the software is used directly by Carlson's clients.  For example, a corporate travel manager might use the subject software to determine/assess how much money his corporation has spent on travel in a given period. (Vetsch Dec., ¶13.)

The "test" environment includes development and quality assurance testing.  The test environment is internal, does not involve direct client access, and is not revenue generating.  The test environment includes developing new functionalities, features or reports with Actuate software to better serve Carlson's clients.  It also includes quality assurance testing of any such new features.  This dispute does not involve Carlson's use of the Actuate software in Carlson's production environment.  The present dispute arises solely from Carlson's use of the Actuate software in the test environment. (Vetsch Dec., ¶14-15.)

Because the test environment is not revenue generating, the industry practice is for software licensed for use in the production environment to be provided for the test environment at no charge or a deeply discounted rate. (Vetsch Dec., ¶16.)

4

D.     **June 1999 Agreement**

The original license agreement between Carlson and Actuate was executed in June 1999.  The agreement granted Carlson a license to use the licensed software programs "on the authorized number of central processing units set forth on <u>Exhibit A</u>"  "Exhibit A" to the original license identified four (4) production computers and one (1) test and development computer for Actuate's "Report Server" software. (Vetsch Dec., ¶17, Ex. C.)

Consistent with industry practice, and with the full knowledge and consent of Actuate, Carlson utilized the licensed software on more than one computer in the test environment.  At no time did Actuate object to or demand any additional payment for Carlson's use of the licensed software on multiple test environment computers. (Vetsch Dec., ¶18.)

E.     **December 15, 2004 "Amendment No. 2" to License Agreement**

By way of Amendment No. 2 to the software license agreement dated December 14, 2004, Carlson acquired the right to install "an unlimited number of copies of the Actuate Software" for a two year term for the sum of $600,000 (through December 15, 2006).  The amendment also called for Carlson to pay an annual maintenance fee of $60,000 during the term.  Upon completion of the two year term, Carlson would receive "a perpetual license to use up to $1,000,000 worth of Software installed by [Carlson]" during the unlimited two year term.  In summary, in return for a payment of $600,000, Carlson would receive a credit of $1,000,000 towards the purchase of licenses it wished to keep following the completion of the two year term. (Vetsch Dec., ¶19, Ex. D.)

Amendment No. 2 called for "[Carlson] and Actuate. . .to perform a joint audit of [Carlson's] computer systems" following completion of the two year term to determine the

amount of software installed.  Consistent with this provision, Carlson and Actuate worked jointly to confirm the amount of software installed in Carlson's system after completion of the term. (Vetsch Dec., ¶20, Ex. D.)  .

As part of this joint "True Up" effort, Carlson fully disclosed, and Actuate had full knowledge of, the number of test environment computers utilizing the licensed Actuate software at that time.  In fact, Actuate Account Representative Michael Reid prepared a spreadsheet documenting Carlson's installed environment prior to the two year term and Carlson's installed environment at the completion of the two year term.  Such spreadsheet expressly acknowledged and confirmed Carlson was utilizing the licensed software on multiple test environment computers both prior to and at the completion of the term. (Vetsch Dec., ¶22, Ex. E.)

With full knowledge Carlson was utilizing the licensed software on multiple test environment computers, and consistent with the past practice and course of performance between the parties, Actuate did not object to such use.  Actuate also did not charge Carlson any additional license fees for such use.  The "True Up" invoice following the unlimited two year term included no charge for the acknowledged multiple test environment computers.  Rather, consistent with industry norms, and past performance, Actuate applied Carlson's one million dollar credit and added additional charges solely for additional production environment computers added during the unlimited two year term. (Vetsch Dec., ¶23, Ex. F.)

Neither Amendment No. 2, nor any documentation involved in the "True Up" process, contained any language restricting or limiting the number of computers Carlson was able to use the licensed software on in the test environment. (Vetsch Dec., Exs. D-F.)

After the "True Up", Carlson continued to use the licensed software on multiple test environment computers with the full knowledge and consent of Actuate.   Carlson retains Actuate consultants to assist with the operation and utilization of Actuate's licensed software.   The Actuate consultants work directly in the test environment, including assisting with development and quality assurance issues.   As a result, such Actuate consultants utilize the Actuate licensed software on multiple test environment computers on an ongoing and regular basis. (Vetsch Dec., ¶24.)

**F.**   **Actuate's Bad Faith Allegations of Infringement/Breach**

Actuate's General Counsel sent a letter to Carlson dated May 15, 2008 entitled "NOTICE OF NON-COMPLIANCE."   The letter alleged Carlson was "using but has failed to pay Actuate for licenses to 11 CPUs of Actuate software and related maintenance and transfer fees."   The letter threatened a claim in excess of four million two hundred thousand dollars and demanded a meeting to resolve the matter. Communications between the parties revealed Actuate's alleged claim of "unlicensed" use and "related maintenance fees" related solely to Carlson's test environment computers. (Vetsch Dec., ¶25, Ex. A.)

Actuate's alleged claim for "transfer fees" is completely unfounded and has no support in the applicable license agreement.   Neither the 1999 License Agreement nor any of the subsequent amendments create any obligation to pay transfer fees or identify the amount of any such transfer fees.   At no time during the approximate nine (9) year life of the license agreement did Actuate ever assert an entitlement to or demand any transfer fee. (Vetsch Dec., ¶27, Exs. C-D.)

In fact, during the course of the license, Actuate had full knowledge Carlson was occasionally "transferring" the licensed software from one computer to another.  Actuate Account Representative's Michael Reid's "True Up" documentation following completion of the two year term expressly acknowledged Carlson had transferred licensed software between multiple computers. (Vetsch Dec., ¶28, Ex. F.)  Consistent with the language of the agreement, as well as the past practice, understanding and course of performance of the parties, Actuate did not object to or charge Carlson in any way for such transfers. (Vetsch Dec., ¶28.)

G.     **Actuate's Bad Faith Threats of Termination and Failure to Comply with the Termination Provision**

The June 1999 software license agreement contains a "TERMINATION" clause at Section 9.01.  The clause provides in relevant part:

> Upon prior written notice given in accordance with section 10.10 either party may terminate this Agreement if the other party (i) fails to pay any amount due under this Agreement within thirty (30) days after written notice of such nonpayment, or (ii) commits a material nonmonetary breach of this agreement , which breach, if capable of being cured, is not cured within thirty (30) days of a written notice of termination.

(Vetsch Dec., ¶29, Ex. C.)

Section 10.10 of the June 1999 software license agreement provides that "[a]ny required notices hereunder shall be given in writing at the address of each party set forth below. . ."  The notice address provided for Carlson was as follows:

> Carlson Wagonlit Travel, Inc.
> 12755 State Highway 55
> Minneapolis, MN 55441
>     Attn: CIO & Legal Department
>     Fax: (612) 212-8543

(Vetsch Dec., ¶30, Ex. C.)

Actuate's May 15, 2008 letter did not constitute the required notice of intent to terminate pursuant to Sections 9.01 and 10.10 of the agreement.  The letter failed to identify or indicate in any way it was a notice of intent to terminate.  The letter was also sent to the wrong recipient  and the wrong address.  The letter was sent to Jason Vetsch, Carlson's Senior Director of Global Information Delivery, at 1405 Xenium Lane, MS 8231, Plymouth, MN 55441. (Vetsch Dec., ¶31, Ex. A.)

Actuate's General Counsel sent an e-mail to Carlson on June 16, 2008 implying that his May 15, 2008 letter constituted the required notice of intent to terminate and that the thirty day (30) cure period expired that day.  His e-mail stated:

> We have clearly communicated through our letter on May 15 that [Carlson] is in breach of its End User License Agreement for failing to pay for software that it has been using.  It is now June 16.  To this end, I suggest that you review [Carlson's] obligations upon termination under Section 9 of the End User License Agreement.

(Vetsch Dec., ¶32, Ex. B.)

Carlson requested clarification whether Actuate intended to terminate the license agreement and noted that Actuate had failed to comply with the express termination notice requirements.  In response, Actuate's General Counsel confirmed it was his contention the May 15th letter constituted proper notice of intent to terminate.  His response threatened that Actuate would treat the license as terminated in ten (10) days – June 26, 2008. ("The parties have 10 days to resolve this matter before Carlson's licenses terminate.") (Vetsch Dec., ¶33, Ex. B.)

As part of its investigation, Carlson has discovered such accusation and threats of termination are part of an apparent ongoing pattern and practice by Actuate to extract money from customers dependent upon its software.  In January 2007, Actuate customer

JPMorgan Chase Bank was forced to commence a declaratory judgment action in the Southern District of New York seeking emergency injunctive relief due to similar unfounded threats of termination against it by Actuate. (*JPMorgan Chase Bank, N.A. v. Actuate Corporation*, Southern District of New York, Case No. 07 Civ. 444 (JFK; AJP)) (Vetsch Dec., ¶34.)

Actuate's dispute with JPMorgan reveals it clearly understands how to send a proper termination notice. Actuate's December 28, 2006 termination notice to JP Morgan: (1) was entitled "Notice of Material Breach and Termination"; (2) expressly stated it "constituted Actuate's formal notice of material breach"; and (3) provided JPMorgan the requisite opportunity to cure ("If JPMC fails to cure these material breaches within thirty (30) days, Actuate will. . .exercise all of its rights under the. . .Agreement.") (Vetsch Dec., ¶35, Ex. G.)

## H. TERMINATION OF THE LICENSE WOULD CAUSE IRREPARABLE HARM TO CARLSON

Carlson is dependent upon the licensed Actuate software for its day to day operations and ongoing provision of travel management services to customers. If Actuate is allowed to wrongfully terminate the license, Carlson, its customers, and traveling consumers will suffer devastating and irreparable harm, including potentially jeopardizing the safety of such travelers. Such harm includes, without limitation:

- Carlson would be in violation of several government contracts with various governmental entities in several countries, as well as nearly all of Carlson's commercial client contracts around the world. These contracts require Carlson to provide timely reporting that is used on a daily basis to manage their respective businesses.

10

- Carlson clients would be deprived of the safety and security features of PMC. These safety and security features allow Travel Managers to pinpoint the location of any given traveler on any given day. This feature is vital to the Travel Manager when trying to determine if they have employees that may be in danger or need assistance due to events such as terrorism or natural disasters at their location.

- Carlson clients would be deprived of the ability to receive travel alerts through the PMC Alerts function. These alerts keep Travel Managers up to date in real time on key events happening that can impact travel worldwide. For example, airline accidents, airport closings, etc.

- Carlson clients would be unable to monitor contractual obligations that they have with their suppliers, such as airlines, hotels and car rental companies. This could cost our clients millions in supplier discount program reductions.

- Carlson clients would be unable to monitor compliance with their travel policies, losing the ability to influence supplier choices or change travel behavior in order to optimize their travel spend.

- Carlson would incur penalties for failure to provide reporting products per the contracts stated above.

- Carlson would suffer loss of existing clients, loss of potential clients, and immeasurable loss of client goodwill.

- Carlson would not be able to fulfill several key components of its client service obligations, including, without limitation, client reporting.

- Carlson would incur significant difficulties in billing its clients, as Actuate reports are used to support the Carlson billing process.

(Vetsch Dec., ¶10.)

Carlson would also be irreparably harmed if Actuate failed to provide the support, maintenance and upgrade services Carlson has paid for and Actuate is obligated to

provide under the license agreement. By way of example, and without limitation, Carlson relies on the Actuate support desk to answer questions about problems it encounters operating the Actuate software. Actuate supports Carlson by answering questions, providing ways to work around the problem or in some occasions provide a software patch to resolve the problem. Without access to the Actuate support desk, Carlson would have a difficult time effectively operating the Actuate software in a reliable and stable fashion for its clients. Carlson also counts on Actuate to provide upgrades to its software which enhance functionality, increase performance or make it more stable. For these ongoing services, Carlson pays Actuate approximately $250,000 in maintenance fees per year over and above amounts previously paid for the license. (Vetsch Dec., ¶11.) While alternative software programs are available, it would take months to successfully acquire, integrate and have such software programs performing at a suitable level. (Vetsch Dec., ¶12.)

To avoid an entirely unwarranted and potentially crippling disruption of Carlson's business, Carlson respectfully requests and seeks emergency injunctive relief from this Court requiring: a) Actuate to maintain the status quo; b) the software license to remain in place until the dispute between the parties can be decided or otherwise resolved; and c) Actuate to continue to provide support services required under the applicable license agreement and for which Carlson has paid, including, without limitation, support, maintenance and upgrades.

# III.
# ARGUMENT

## A.    Standard for Granting a Temporary Restraining Order

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of temporary restraining orders.  Fed. R. Civ. P. 65(b).  The primary purpose of a temporary restraining order is to preserve the status quo so as to protect the respective rights of parties pending a determination on the merits.  *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984); *Minnesota Mining and Manufacturing Company v. Meter ex rel. N.L.R.B.*, 385 F.2d 265, 273 (8th Cir. 1967).

Courts consider the following four factors when determining whether to issue a temporary restraining order:

(1)    the probability that the movant will succeed on the merits of its claim;

(2)    the threat of irreparable harm to the movant;

(3)    the balance between the harm to the movant if injunctive relief is denied and the injury that will result if such relief is granted; and

(4)    the public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Jackson v. National Football League*, 802 F. Supp. 226, 229 (D. Minn. 1992) (Doty, J.); *Empi, Inc. v. Iomed, Inc.*, 923 F. Supp. 1159, 1163 (D. Minn. 1996) (Davis, J.).  No single factor in itself is dispositive, rather all factors must be considered to determine whether on balance they weigh in favor of granting the injunction.  *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987); *Empi, Inc.*, 923 F. Supp. at 1163.  "The resultant "sliding scale" approach is not mathematical in nature; rather "it is more

properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *The Little Tikes Co. v. Kid Station Toys, Ltd.*, 2008 WL 1805379 (N.D.Ill.,2008) (unpublished opinion) (Declaration of Michael M. Lafeber, Exhibit A.) *citing Abbott Labs. v. Mead Johnson & Co. .,* 971 F.2d 6, 12 (7th Cir.1992)

## B.      The Balance of Harms Favors Carlson

### 1.      Carlson Will Suffer Irreparable Harm if an Injunction is Not Issued

To prevail on a motion for a temporary restraining order, Carlson must only establish a threat of irreparable harm, not actual irreparable harm. *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir. 1990) ("Requiring a showing of actual injury would defeat the purpose of the preliminary injunction, which is to prevent an injury from occurring."); *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations … and, of course, it can be utilized even without a showing of past wrongs."); *Baker Electric Cooperative, Inc. v. Chaske*, 28 F.3d 1466, 1472-73 (8th Cir. 1994) (preliminary injunction was justified based on a showing of a threat of irreparable harm).  Here, the facts compel a finding of irreparable harm if Actuate is allowed to follow through with its threats to terminate the license.

Courts have recognized that the threatened or impending termination of a critical intellectual property license and the resulting business disruption constitutes irreparable harm justifying maintaining the status quo and preventing termination of the license. *The Little Tikes Co. v. Kid Station Toys, Ltd.*, 2008 WL 1805379 (N.D.Ill.,2008) (unpublished opinion) (Lafeber Dec., Ex. A.)  *Little Tikes* involved a trademark licensor's attempts to terminate a distributor's relevant trademark license.  Despite acknowledging the licensor

14

was likely to succeed on the merits and had a good faith basis for terminating the license, the Court determined the potential harm to the licensee resulting from any termination greatly outweighed any alleged potential harm to the licensor.  The licensee had presented evidence that if the license was terminated, it would "be unable to meet its current contractual obligations and it [would] consequently suffer serious and perhaps mortal damage to its business." *Id.*  In light of such evidence, the Court found the balances of harm "tipping strongly" in favor of the licensee.

The same analysis applies in the present case.  Actuate's threatened termination of the license would result in potentially devastating disruption to Carlson's operations and provision of services to its customers, including, without limitation, jeopardizing the safety of travelers.

2.    **Actuate has an Adequate Monetary Remedy**

Courts recognize that the status quo should be maintained when the party seeking termination of an intellectual property license has an adequate remedy for any alleged breach. *Hodge Business Computer Systems, Inc. v. U.S.A. Mobile*, 910 F.2d 367 (6th Cir. 1990) (refusing to enjoin use of software because "only harm [licensor] could suffer from the continued use of the software is monetary -- the loss of license fees.") (opinion withdrawn due to dismissal of appeal); *The Little Tikes Co. v. Kid Station Toys, Ltd.*, 2008 WL 1805379 (N.D.Ill.,2008) (unpublished opinion) (Lafeber Dec., Ex. A.) (refusing to terminate trademark license where licensor would continue to receive royalties and fees during pendency of dispute.)

In the present case, Actuate has an adequate remedy in the form of monetary damages – specifically license fees – in the event it can establish Carlson utilized licensed

15

software in an unauthorized manner.   Actuate has actually presented Carlson with claimed calculations of supposed back license, maintenance and transfer fees allegedly due and owing.  Moreover, Carlson will continue paying Actuate the relevant fees not in dispute during the pendency of this dispute.

       3.    **Public Interest**

Termination of the license agreement and resulting disruption of Carlson's provision of travel management services could effect countless travelers, including jeopardizing the safety of certain travelers.

**C.**    **Carlson Will Succeed on The Merits.**

       1.    **Actuate's Allegations of Breach are Unfounded**

The June 1999 Agreement contains a choice of law provision indicating California law applies.   No conflict exists between Minnesota and California concerning the relevant principals of contract interpretation and therefore the Court need not decide whether the choice of law provision controls.

Both Minnesota and California provide that course of performance of the parties is the most compelling evidence in interpreting and applying a contract.[1] *Restatement (Second) of Contracts* § 202(4) ("Where an agreement involves repeated occasions for

---

[1] Several courts have applied U.C.C. Article 2 governing the sale of "goods" to software license agreements. *Validity, Construction, and Application of Computer Software Licensing Agreements,* 38 A.L.R.5th 1 (1996) ("In the following cases the courts held or recognized, either explicitly or by implication, that Article 2 of the Uniform Commercial Code applies to agreements involving, to some degree, computer software licenses. *RRX Indus. v Lab-Con, Inc.* (1985, CA9 Cal) 772 F2d 543, 41 UCCRS 1561 (applying California law). . .") (remaining string cite of 19 additional cases omitted.)  The Court need not decide this issue because there is no conflict between U.C.C. Article 2, the common law or other applicable U.C.C. or statutory provisions governing the relevant issues.

performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."); *see also Id.* at Comment g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."); *U.S. v. Floyd*, 1 F.3d 867 (9th Cir. 1993) ("[A]ctions *subsequent* to the execution of" an agreement best evidence of meaning – such evidence not precluded by parol evidence rule.); *Cornell v. N.F.C. Eng'g Co.,* 144 N.W.2d 369, 371-72 (Minn. 1966) (Evidence of either course of performance or course of dealing is useful because it demonstrates the parties' practical construction of the terms of a contract, which is highly probative of their intent.)  *See also* California Code of Civil Procedure §1856 ("(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. . .(c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance.")

Course of performance is controlling regardless of the presence of a "merger" or "integration" clause.  *Rampage Vineyard, LLC v. Hat* 2007 WL 4126965 (2007) (Usage evidence allowed regardless of integration or merger clause -- "Usage evidence does not alter the contract of the parties. Rather, it gives effect to the words as intended by the parties. The usage becomes a part of the contract in aid of its correct interpretation.") *citing Paramount Television Productions, Inc. v. Bill Derman Productions*  258 Cal.App.2d 1, 10-11 (1968)

In the present case, Amendment No. 2 governing Carlson's current configuration and use of Actuate software contained no language restricting or limiting the number of computers Carlson was able to use the licensed software on in its test environment.  The absence of any such restriction is confirmed by the parties' performance under the contract over a several year period.  Actuate has had full knowledge Carlson was utilizing the licensed software on multiple test environment computers before, during and after the two year unlimited term.  The documentation provided by Actuate as part of the "True Up" in 2006 (the "True Up" being the procedure for determining how much Carlson owed for its current use) unambiguously acknowledges and confirms Carlson was utilizing the software on multiple test environment computers.

Despite having full knowledge of such usage, and multiple opportunities to object, Actuate failed to do so. *See Restatement (Second) of Contracts* § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.")

a.      **Transfer Fees**

Neither the 1999 License Agreement nor any of the subsequent amendments create any obligation to pay transfer fees. In addition to the absence of any language creating such an obligation, none of the documents identify or calculate the amount of such fees even if such obligation existed.

At no time during the approximate nine year life of the license agreement did Actuate ever assert an entitlement to or demand any transfer fee.  Actuate never asserted

or claimed transfer fees despite having full knowledge Carlson was occasionally "transferring" the licensed software from one computer to another.  Actuate Account Representative's Michael Reid's "True Up" documentation expressly acknowledged Carlson had transferred licensed software between multiple computers.  Consistent with the language of the agreement, as well as the past practice, understanding and course of performance of the parties, Actuate never objected to or charged Carlson in any way for such transfers.

2.    <strong>Actuate Failed to Comply with the Termination Provision</strong>

Actuate has failed to abide by the applicable termination provision and therefore cannot terminate the contract.  Actuate's contention its May 15, 2008 correspondence constituted the required notice and commenced the thirty (30) day cure period lacks merit.

The "TERMINATION" clause provides that "[u]pon prior written notice given in accordance with section 10.10 either party may terminate this Agreement if the other party (i) fails to pay any amount due under this Agreement within thirty (30) days after written notice of such nonpayment, or (ii) commits a material nonmonetary breach of this agreement, which breach, if capable of being cured, is not cured within thirty (30) days of a written notice of termination."  Actuate contends its May 15, 2008 correspondence complied with Section 9.01(i). (June 16, 2008 e-mail, Vetsch Dec., Ex. B.) ("You can hardly contend that the May 15th letter failed to put the CIO and legal department of CWT on notice that CWT had failed to pay monies due under the End Use Software License Agreement.  That claim triggered the 30 day period to cure under Section 9.01(i).")

Contrary to Actuate's claims, the May 15th letter did not identify any specific or liquidated amount of money past due under the agreement.   Rather, the letter made reference to a potential unliquidated damage claim in excess of four million dollars and invited the parties to engage in settlement discussions.   Even if Carlson had wanted to "cure" such alleged breach, it would have had no way of knowing how much money it needed to pay.   An unliquidated and unspecified claim for damages is not the type of "money due under the agreement" contemplated by Section 9.01.   Moreover, the May 15the letter made absolutely no mention of termination or intent to terminate.

Actuate knows how to send a procedurally proper termination notice as evidenced by its dispute with JPMorgan.   Actuate's notice therein was: (1) titled "Notice of Material Breach and Termination"; (2) expressly stated it "constituted Actuate's formal notice of material breach"; and (3) provided JPMorgan the requisite opportunity to cure ("If JPMC fails to cure these material breaches within thirty (30) days, Actuate will. . .exercise all of its rights under the. . .Agreement.")   Actuate cannot in good faith argue its May 15th letter – which did not claims to be a termination notice, did not provide an opportunity or ability to cure, and was sent to the wrong addressee – constituted appropriate notice of termination.

**D.**      **Security Bond**

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure the Court must set an appropriate bond in connection with ordering injunctive relief.   Fed. R. Civ. P. 65(c). The law provides that the amount of the security bond required in connection with the issuance of a temporary restraining order is within the discretion of the Court.   *Paul's Industrial Garage, LLC v. City of Red Wing,* No. 06-4770 (RHK/JSM), 2006 WL

3804243 at *8 (D. Minn. Dec. 22, 2006) (Lafeber Dec., Ex. B.)  Here, the factors weigh in favor of a small security bond.  Carlson is a well established global business that clearly is in a position to satisfy any potential damages arguably resulting from Actuate's inability to terminate the license agreement in advance of a preliminary injunction hearing.

Any such "potential" damages are extremely limited in nature.  Assuming no cure by Carlson, such damages would consist of a small pro rata portion of claimed test environment license fees covering the period prior to a formal preliminary injunction hearing.  Moreover, the facts reveal Actuate has no substantive or procedural basis to terminate the license at this time, and that Carlson is likely to succeed on the merits. Accordingly, no wrongful injury will result from the issuance of the requested injunction. Accordingly, Carlson respectfully requests that no bond be required, or if it is required, that it be in a minimum amount of $1,000.

## CONCLUSION

In light of the foregoing, Plaintiff Carlson Wagonlit Travel, Inc. respectfully requests that the Court issue a temporary restraining order which: a) requires Actuate to maintain the status quo; b) requires the software license to remain in place until the dispute between the parties can be decided or otherwise resolved; and c) requires Actuate to continue to provide support services required under the license agreement and for which Carlson has paid, including, without limitation, support, maintenance and upgrades.

Dated:  June 23, 2008                    **BRIGGS AND MORGAN, P.A.**


By  s/Michael M. Lafeber
   Michael M. Lafeber (#242871)
   Lindsey D. Saunders (#387990)
80 South Eighth Street
2200 IDS Center
Minneapolis, MN 55402
Telephone:  612-977-8400
Facsimile:  612-977-8650

**ATTORNEYS FOR PLAINTIFF**

2198172v6